IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No.  24-cr-00251-RMR

UNITED STATES OF AMERICA,

        Plaintiff,

v.

4. ADAM SHORR,
6. BRADLEY EDSON, and
7. JOHN GAUTEREAUX,

        Defendants.

_____

### SUPERSEDING INDICTMENT
_____

The Grand Jury charges:

### COUNT 1
### (18 U.S.C. § 1349)

At all times material to this Indictment:

**The Medicare Program**

1.      The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"),

oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.    Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.    Medicare covered different types of benefits and was separated into different program parts. Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4.    Medicare providers included independent clinical laboratories, physicians, and other health care providers who provided items and services to Medicare beneficiaries. To submit claims for reimbursement to Medicare, a provider was required to submit a Medicare Enrollment Application Form to Medicare. The application contained certifications that the provider was required to make before the provider could enroll. Specifically, the application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

5.    A Medicare provider number was assigned to a provider upon approval of the provider's application. A health care provider that received a Medicare provider

2

number was able to submit claims with Medicare to obtain reimbursement for services provided to beneficiaries.

6.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number; (b) the billing codes for the benefit, item, or service provided or supplied to the beneficiary (referred to as Current Procedural Terminology, or CPT, codes); (c) diagnosis codes (referred to as ICD-10 codes); (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; (e) the name of the referring physician or other health care provider; and (f) the referring provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

7.      When submitting claims to Medicare for reimbursement, providers were required to certify that: (1) the contents of the forms were true, correct, and complete; (2) the forms were prepared in compliance with the laws and regulations governing Medicare; and (3) the services that were purportedly provided, as set forth in the claims, were medically necessary.

8.      Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

9.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for

3

services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service. Novitas Solutions Inc. and Palmetto GBA were MACs.

**Coverage for Genetic Testing**

10.     Genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of diseases in the future. There were different types of genetic testing, such as cancer genetic testing (referred to as "CGx"), cardiovascular genetic testing, pharmacogenomic testing (referred to as "PGx"), and others. Genetic testing was not a method of diagnosing whether an individual presently had a certain medical condition or disease.

11.     To complete a genetic test, the patient typically provided a cheek swab (buccal swab) containing DNA material. Tests were then run for different genes identified by the clinical laboratory. Clinical laboratories were responsible for identifying billing codes—referred to as CPT codes—to submit claims for testing. Each CPT code had its own reimbursement rate determined by the payer. Claims also identified the diagnoses codes that purported to justify the testing.

12.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R.

§ 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

13.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. The regulations provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." 42 C.F.R. § 410.32(a). "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

**The Defendants, Related Entities, and Relevant Persons**

14.     Tesis Labs LLC, also known as Tesis Biosciences LLC ("Tesis"), was a limited liability company formed under the laws of Delaware in or around October 2019.

15.     Tesis, through various entities, owned and operated four independent clinical laboratories at times throughout the conspiracy charged. Claro Scientific Laboratories, Inc. ("Claro") was an independent clinical laboratory enrolled with Medicare and Colorado Medicaid with its principal place of business in Colorado. Tesis acquired the laboratory in or around January 2020. Alliance DX, LLC ("Alliance") was an independent clinical laboratory enrolled with Medicare, with its principal place of business in Texas. Tesis acquired the laboratory in or around November 2020. 303

Diagnostics, LLC ("303 Diagnostics") was an independent clinical laboratory enrolled with Medicare with its principal place of business in Colorado. Tesis acquired 303 Diagnostics in or around December 2020. The three foregoing laboratories are, hereinafter, the "Tesis Laboratories." Tesis Labs of Arizona LLC ("Tesis Arizona") was an independent clinical laboratory that, among other things, Tesis held out as performing genetic testing for which other third-party laboratories would bill Federal health care programs (referred to as "reference testing"). Tesis Arizona was established in or around October 2021 with its principal place of business in Arizona.

16.     Defendant ADAM SHORR was a beneficial owner of Tesis through an entity he controlled, A&E Czech Enterprises, LLC, which was a member of the Tesis limited liability company. SHORR identified his wife as the manager of A&E Czech Enterprises, LLC, but she did not participate in Tesis business. SHORR agreed to be a "Business Consultant" for Tesis, and he worked with call centers and "marketing" groups that worked with and sold referrals to the Tesis Laboratories.

17.     Co-conspirator Ronald King was the CEO of Tesis and a beneficial owner of Tesis through an entity he controlled, Vytal Healthcare Solutions, which was a Member of the Tesis limited liability company. King was also associated with, and provided direction to, the billing company ("Billing Company") which reviewed and submitted the Tesis Laboratories' genetic testing claims to Medicare, Medicaid, and commercial insurance companies.

18.     Co-Conspirator Victor Roiter was a beneficial owner of Tesis through an entity he controlled, Redstone Consulting, LLC, which was a Member of the Tesis

limited liability company. Roiter was identified as the Vice President of Marketing for Tesis.

19.    Co-conspirator Tina Wellman was a beneficial owner of Tesis through an entity she controlled, Valley Vantage Consulting, LLC, which was a Member of the Tesis limited liability company. At times, Wellman was identified as the Chief Operating Officer of Tesis. Wellman was also the CEO and owner of the Billing Company, which had a principal place of business in New York.

20.    Autumn Partnership LLC ("Autumn Partnership") was a company that the founders of Tesis—SHORR, Ronald King, Victor Roiter, Tina Wellman, John Gautereaux, Robert O'Sullivan, and Bradley Edson—used in 2019 and early 2020 as a "proof of concept" for the Tesis business model.

**The Conspiracy**

21.    Between in or around September 2019, and continuing through at least December 2022, in the state and District of Colorado and elsewhere, Defendant ADAM SHORR and co-conspirators Ronald King, Victor Roiter, and Tina Wellman, did knowingly and voluntarily conspire and agree together and with each other to commit offenses against the laws of the United States, that is:

a.    to knowingly, and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice,

7

to knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

b.    to knowingly and willfully execute a scheme and artifice to defraud a health care benefit programs affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

**Manner and Means of the Conspiracy**

22.    Acting interdependently, Defendant ADAM SHORR and his co-conspirators carried out the conspiracy using the following manner and means, among others:

23.    The co-conspirators agreed to work together to acquire and operate Medicare-enrolled independent clinical laboratories to obtain payment from Medicare, Medicaid, and commercial insurers for genetic testing. The co-conspirators agreed that Tesis would own the laboratories with the goal of growing revenue from genetic testing to a sufficient level to sell Tesis or to take the company public and to profit therefrom. The co-conspirators agreed that they would solicit loans and investments to operate the

business. At all times during the conspiracy, the co-conspirators were informed about revenue targets that needed to be hit to meet the demands of investors and the objective to sell Tesis.

24.     To generate payments for genetic testing from Federal health care programs, SHORR, his co-conspirators, and others known to the grand jury agreed to offer and cause the payment of illegal kickbacks and bribes to individuals (identified as "marketers"), including via interstate wire communication, to induce the referral to the Tesis Laboratories of beneficiaries for genetic testing and in exchange for arranging for doctors' orders for genetic testing. The co-conspirators agreed to pay these individuals based on the volume and value of the anticipated reimbursement by the payer for the tests, negotiating payment based on the number and type of tests the marketer committed to send to the Tesis Laboratories each month.

25.     The co-conspirators concealed and disguised the nature and source of these kickbacks and bribes through sham invoices and contracts, which, among other things, falsely stated that the contracts were based on "fair market value," falsely described the basis for the payments as purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that the marketers did not perform, and purported to provide for payment of a "flat fee" to conceal the per-test payment structure used to induce referrals. The co-conspirators caused the Tesis Laboratories to enter into sham contracts with marketers to conceal their kickback relationships. SHORR and others also caused marketing companies to create sham invoices to conceal their kickback relationships.

26.    This kickback model was based, in part, on the model used at Autumn Partnership—the "test case" or "proof of concept" for Tesis, as further described in paragraphs 51 and 52.

27.    SHORR and his co-conspirators agreed to pay and caused the payment to marketers for referrals with doctors' orders for genetic tests they knew were obtained through materially false and fraudulent pretenses, representations, and promises.

28.    SHORR and his co-conspirators agreed to pay marketers they knew would target Federal health care program beneficiaries—mainly the elderly who were likely to be Medicare beneficiaries—by using telemarketers at call centers to solicit and induce the beneficiaries to accept genetic tests regardless of medical necessity and through materially false and fraudulent pretenses, representations, and promises.

29.    The co-conspirators directed and caused marketers to use telemedicine companies, approved by Tesis, to obtain doctors' orders for medically unnecessary genetic tests. These telemedicine providers used personal health information solicited by telemarketers from the beneficiary and a brief telephonic call with the beneficiary as the basis for signing the test requisition form (the doctor's order). These providers never examined the beneficiaries, typically spoke to each beneficiary for only a few minutes, relied on beneficiaries' self-reported medical information as solicited by telemarketers or other information telemarketers chose to identify as the beneficiaries' personal medical information (without regard to its accuracy), did not treat or diagnose the beneficiaries with any medical conditions, and neither intended to use nor used the genetic test results to treat or diagnose the beneficiaries. The co-conspirators knew that the

10

marketing companies paid the telemedicine companies on a per-patient basis for the orders.

30.    The co-conspirators also paid marketing companies to obtain doctors' orders for medically unnecessary genetic tests through a process the co-conspirators referred to as "doctor chase," by which the marketers used call center representatives to induce the beneficiary to identify their primary care physician, and the marketer "chased" the physician and made false and fraudulent representations to induce the physician to sign off on prepopulated requisition forms transmitted to the doctors' offices. The requisition forms sent to physicians through the doctor chase process relied on beneficiaries' self-reported medical information as solicited by telemarketers or other information telemarketers chose to identify as the beneficiaries' personal medical information (without regard to its accuracy).

31.    SHORR and his co-conspirators caused marketers to solicit beneficiaries' personal medical information and to identify for the beneficiaries certain medical conditions that could be translated into diagnosis codes (ICD-10 codes) that the Billing Company had identified as superficially adequate to justify the "medical necessity" of the tests on paper and that would be submitted to the payers to support the laboratories' claims for payment. The co-conspirators used "medical necessity training" for the marketers and a "rejection" and "correction" process to direct marketers to identify diagnosis and other codes to place on doctors' orders to support and maximize reimbursement. The co-conspirators, through laboratory employees and through Billing Company representatives located in India, caused marketers to "correct" doctors' orders

that the Billing Company "rejected" as having insufficient codes to obtain high enough reimbursement by adding or changing diagnosis codes. Only "accepted" samples counted toward the marketers' referral quotas.

32.    SHORR and his co-conspirators tracked and caused Tesis and Billing Company employees to track the number and type of referrals each marketing company submitted, sharing this information with the marketers to ensure the marketers met their monthly referral numbers. The co-conspirators used the number of "accepted" samples for each marketer in determining amount and timing of payment and contract status, including whether to terminate a marketer or to offer the marketer a second contract with a different Tesis laboratory to compensate them for an increased number of referrals.

33.    SHORR and his co-conspirators caused genetic samples with doctors' orders to be shipped to the laboratories in Colorado and Texas. Laboratory employees in Colorado and Texas processed the swabs sent to the labs for testing, tracked the numbers of referrals and rejected/accepted status for marketers, and shipped supplies to marketers to use to obtain testing samples.

34.    When Claro began submitting claims to Medicare for reimbursement for genetic tests in 2020, Claro did not have the ability to conduct any genetic testing. Until Claro developed the capability to run its own genetic testing, Claro paid reference labs a set fee per test to run the genetic tests while Claro submitted the claims to Medicare for the tests.

35.    Throughout the conspiracy, SHORR and his co-conspirators caused the submission, through the Tesis Laboratories, of false and fraudulent claims to Medicare, including via interstate wire communication, for genetic tests that were: (a) induced through kickbacks and bribes in violation of the Anti-Kickback Statute; (b) obtained by deceiving beneficiaries and providers; and (c) not medically necessary and not eligible for reimbursement.

36.    The co-conspirators submitted, and caused the submission of, fraudulent claims to Medicare, including through the use of interstate wire communication, on behalf of the Tesis Laboratories. Those claims totaled approximately $60 million. The Tesis Laboratories received payments for these claims of more than $40 million.

37.    King participated in soliciting and receiving money from investors to further and perpetuate the scheme, including to pay marketers, and kept the co-conspirators informed about the status of investments.

38.    In or around November 2021, the Tesis Laboratories stopped accepting referrals for genetic tests authorized by telemedicine providers. To compensate for the lost revenue, the co-conspirators agreed to have Tesis begin to offer services as a reference laboratory. The co-conspirators knew that third-party laboratories would bill Medicare for the genetic tests Tesis completed, including those authorized by telemedicine providers. By acting as the "reference" lab, the co-conspirators believed they could conceal their knowledge of billing they knew was impermissible while still generating revenue.

39.    In or around May 2022, the co-conspirators agreed to have Tesis perform the testing for which Laboratory A would submit claims to Medicare and other payers, in exchange for payment for the testing. The co-conspirators knew that the owner of Laboratory A had run a marketing company that Tesis had terminated due to issues with noncompliant practices and because of the company's use of telemedicine to obtain doctors' orders. Nevertheless, the co-conspirators agreed to complete the testing for Laboratory A, which they knew continued the same illegal practices, and thus caused and enabled fraudulent billing by Laboratory A to Medicare. SHORR and Roiter invested in Laboratory A by sending money to the owner of Laboratory A to promote and further profit from the laboratory's business. Laboratory A submitted claims totaling over $500,000 to Medicare.

40.    The co-conspirators used the fraudulent proceeds received from Medicare and from investors in the fraudulent business model to benefit themselves and others and to further the fraud.

The foregoing is in violation of Title 18, United States Code, Section 1349.

### COUNTS 2 – 12
(18 U.S.C. §§ 1347 & 2)

41.    Paragraphs 1 through 20 are re-alleged and incorporated by reference.

42.    On or about the dates set forth below, in the District of Colorado and elsewhere, Defendant ADAM SHORR, did knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and

14

property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, which scheme is set forth in paragraphs 23 through 35, by causing the submission to Medicare of the following claims for genetic testing by Claro:

| Count | On or About Date | Claim Number | Beneficiary | Total Claim Amount Billed |
|---|---|---|---|---|
| 2 | December 22, 2020 | 910220357360390 | L.G. | $5,230 |
| 3 | December 28, 2020 | 910220363316410 | E.G. | $5,230 |
| 4 | December 28, 2020 | 910220363316420 | K.M. | $5,230 |
| 5 | December 28, 2020 | 910220363216100 | C.S. | $5,230 |
| 6 | December 28, 2020 | 910220363216140 | F.W. | $5,230 |
| 7 | January 13, 2021 | 910221013348020 | J.V. | $5,230 |
| 8 | January 13, 2021 | 910221013347610 | P.F. | $5,230 |
| 9 | January 13, 2021 | 910221013347840 | M.J. | $5,230 |
| 10 | January 13, 2021 | 910221013348080 | J.J. | $5,230 |
| 11 | January 28, 2021 | 910221028362430 | S.W. | $5,230 |
| 12 | February 19, 2021 | 910221050352810 | C.N. | $5,230 |

The foregoing is in violation of Title 18, United States Code, Sections 1347 and 2.

### COUNT 13
### (18 U.S.C. § 371)

43.     Paragraphs 1 through 6 and 14 through 20 are re-alleged and incorporated by reference as though fully set forth herein.

44.     The Medicaid Program ("Medicaid") provided health coverage to low-income adults, children, pregnant women, elderly adults, and people with disabilities. Medicaid was a federal- and state-funded health care program administered by states, according to federal requirements. Each state had a Medicaid program, and all Medicaid programs, including Colorado's program, were "Federal health care programs" as defined in Title 42, United States Code, Section 1320a-7b(f).

15

45.    Defendant BRADLEY EDSON was a beneficial owner of Tesis through entities that were members of the Tesis limited liability company. EDSON caused his business partner to be identified as the responsible individual or manager for each entity that held shares in Tesis and for which EDSON was a beneficial owner.

46.    Defendant JOHN GAUTEREAUX was a beneficial owner of Tesis through Quant BPO, LLC, which was as a member of the limited liability company. JOHN GAUTEREAUX was a beneficial owner of Quant BPO, LLC through an entity in which he was a member.

47.    Robert O'Sullivan was a beneficial owner of Tesis through Quant BPO, LLC, which was a Member of the Tesis limited liability company. O'Sullivan was a beneficial owner of Quant BPO, LLC through an entity he controlled, FAM Enterprises LLC.

48.    Commercial health insurers, such as United Health Care, Aetna, and Humana, were health care benefit programs as defined in Title 18, United States Code, Section 220(e)(3).

49.    Between in or around September 2019 and continuing through at least December 2022, in the State and District of Colorado and elsewhere, the defendants, ADAM SHORR, BRADLEY EDSON, and JOHN GAUTEREAUX, and co-conspirators Ronald King, Victor Roiter, Tina Wellman, and Robert O'Sullivan, did knowingly and voluntarily, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with each other and with others known and unknown to the grand jury, to commit offenses against the laws of the United States, that is:

16

a.      to violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by knowingly and willfully soliciting and receiving any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program;

b.      to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, that is, Medicare and Colorado Medicaid; and

c.      to violate Title 18, United States Code, Section 220(a)(2)(A), by knowingly and willfully offering and paying remuneration, including any kickback, bribe, or rebate, directly and indirectly, overtly and covertly, in cash and in kind, to induce a referral of an individual to a laboratory, with respect to services covered by a health care benefit program in and affecting interstate commerce.

**Manner and Means of the Conspiracy**

50.     Acting interdependently, the defendants and co-conspirators carried out the conspiracy using the manner and means described below.

17

51.    In or around mid-2019, the co-conspirators agreed they would acquire and operate genetic testing laboratories to obtain payment from Medicare, Medicaid, and commercial insurers. Tesis was established for that purpose in or around October 2019. The co-conspirators determined that their business model would be based on using individuals and entities that identified themselves as "marketers" to solicit beneficiaries to participate in genetic testing and to obtain doctors' orders for genetic testing.

52.    Before purchasing and operating their own laboratory, the co-conspirators engaged in a "proof of concept" project. The co-conspirators used Autumn Partnership LLC and other entities to solicit and receive kickbacks and bribes from Laboratory Z in exchange for obtaining doctors' orders for genetic testing and referring beneficiaries with those orders to a laboratory that would bill Medicare for those referrals. The co-conspirators solicited payment based on the volume and value of the anticipated reimbursement by Medicare for the tests referred to Laboratory Z. Co-conspirators concealed the illicit payments in sham contracts, which concealed the true nature of the payment and falsely described the nature of the agreement as providing "services" to Laboratory Z when they were actually selling referrals. The co-conspirators purchased Medicare beneficiaries' data—which they referred to as "leads" for genetic testing—and hired "marketers" to solicit leads, similarly using sham contracts to conceal the kickbacks and bribes that they offered to the "marketers."

53.    Through the "proof of concept", the co-conspirators generated payments from Medicare to the laboratory to which they sold their genetic testing referrals with the goal to demonstrate a profit on the difference between the payment amount and the

amount they received in kickbacks and bribes from the laboratory. In generating proof of profits, the co-conspirators expected to obtain investor funding to purchase their own genetic testing lab.

54.    In or around January 2020, the co-conspirators acquired their first Tesis laboratory to enable them to bill Medicare directly. To generate payments for genetic testing from Federal health care programs and commercial health insurers to the Tesis Laboratories, the co-conspirators agreed to offer and cause the payment of kickbacks and bribes to individuals (identified as "marketers"), to induce the referral to the Tesis Laboratories of beneficiaries for genetic testing and in exchange for arranging for doctors' orders for genetic testing. The co-conspirators agreed that the Tesis Laboratories would pay these individuals based on the volume and value of the anticipated reimbursement by Medicare, Medicaid, and commercial health insurers for the tests, negotiating payment based on the number and type of tests the individual marketers committed to send to the Tesis Laboratories each month and the expected reimbursement for those tests.

55.    This kickback model was based, in part, on the model the co-conspirators developed during the Autumn Partnership "proof of concept."

56.    The co-conspirators concealed and disguised the nature and source of these kickbacks and bribes through sham invoices and contracts, which, among other things, falsely stated that the contracts were based on "fair market value," falsely described the basis for the payments as purportedly legitimate "marketing and business services" that the co-conspirators did not intend for the marketers to perform and that

19

the marketers did not perform, and purported to provide for payment of a "flat fee" to conceal the per-test payment structure used to induce referrals. The co-conspirators caused the Tesis Laboratories to enter into sham contracts with marketers to conceal their kickback relationships. ADAM SHORR and others also caused marketing companies to create sham invoices to conceal their kickback relationships.

57.     ADAM SHORR and co-conspirators caused marketers to solicit beneficiaries' personal medical information and to identify for the beneficiaries certain medical conditions that could be translated into diagnosis codes (ICD-10 codes) that the Billing Company had identified as superficially adequate to justify the "medical necessity" of the tests on paper. The co-conspirators used "medical necessity training" for the marketers and a "rejection" and "correction" process to direct marketers to identify diagnosis and other codes to place on doctors' orders to enable and maximize reimbursement. The co-conspirators, through laboratory employees and through Billing Company representatives located in India, caused marketers to "correct" doctors' orders that the Billing Company "rejected" as having insufficient diagnosis codes to obtain high enough reimbursement by adding or changing diagnosis codes. Only "accepted" samples counted toward the marketers' referral quotas.

58.     The co-conspirators tracked and caused Tesis and Billing Company employees to track the number and type of referrals each marketing company submitted, sharing this information with the marketers to ensure the marketers met their monthly referral numbers. The co-conspirators used the number of "accepted" samples for each marketer in determining amount and timing of payment and contract status,

20

including whether to terminate a marketer or to offer the marketer a second contract with a different Tesis laboratory to compensate them for an increased number of referrals.

59.    EDSON and King participated in soliciting and receiving money from investors to further and perpetuate the scheme, including to pay marketers, and kept the co-conspirators informed about the status of investments.

60.    The defendants caused the payment of millions of dollars in kickbacks and bribes to marketing companies for the referrals.

61.    The co-conspirators used the proceeds received from Medicare and Medicaid as a result of the kickback scheme and funds from investors and lenders in the illicit business model to benefit themselves and others and to further the fraud.

**Overt Acts**

62.    In furtherance of the conspiracy's objectives, one or more of the co-conspirators committed one or more of the following acts in the State and District of Colorado and elsewhere.

63.    On or about September 12, 2019, GAUTEREAX, e-mailed King, Roiter, and an individual at Laboratory Z attaching a "Professional Services Agreement" and stated, "[B]elow are the assumptions that back into the 'Exhibit B' language of 'no more than $200,000 per month' at a flat rate" and listed "Assumptions: $5k (appx) EOB per / - $350 COGS / x .45% = $2093.00 / x 100 = $209,000 per 100 Sample Kits Adjudicated."

64.    On or about October 5, 2019, EDSON responded to an e-mail from GAUTEREAUX regarding the "Autumn Partnership Weekly Expense/Cashflow Report,"

21

stating: "I would like to come up with a better descriptor for 'Doctor Chase' that we can use for our internal reports and communications both internal and external which may be at times forwarded to additional third parties. Some thoughts I had were 'Physician Compliance' or Physician Confirmation or possibly Medical Certification, or Medical Confirmation, or Treatment Confirmation? I am open to suggestions but I think the term Doctor Chase will be an 'optics issue' that shines a light on potential areas of discussion best not focused on. So I want to abandon that term at our earliest opportunity."

65.    On or about October 21, 2019, GAUTEREAUX e-mailed King and Roiter an "updated" agreement to "send along to the first rep group," and attached an "Independent Contractor Agreement" that provided for the "provision of marketing and sales services" at the rate of $150,000 per month for "services" based on having "___ number of staff devoted to the services provided."

66.    On or about October 22, 2019, King e-mailed EDSON with the subject, "Sample Agreements," and explained that agreements for business development "are written under safe Harbor rules and can sometime seem benign based on the needs to sell services related to a non fee splitting approach." King attached a document that contained an explanation of the Anti-Kickback Statute, which stated, among other things, "that parties on both sides of an impermissible 'kickback' transaction may be found criminally liable," and provided an example of an illegal kickback as "paying a healthcare provider a per patient amount for the physicians' services in collecting blood."

67.     On or about November 6, 2019, GAUTEREAUX e-mailed individuals from Laboratory Z, Roiter, and King and attached the "'new' best version of Exhibits A & B." Attached Exhibit A identified "Laboratory Professional Services" purportedly to be provided, and Exhibit B called for payment of $189,000 per month "for the services set forth in Exhibit 'A'" and "inclusive of [the Company] having 10  number of staff devoted to the services provided."

68.     On or about December 4, 2019, GAUTEREAUX e-mailed King and Roiter a document titled "Autumn Partnership Generic IC Agreement 2019_Final.docx" and stated, "Here's the 'blank' version for your insertion of company/contact information.  I've left the amount to be paid blank (Ex. B); I'm assuming that is TBD at this point. Let me know if I can be of assistance on any phone calls with the rep(s), etc."

69.     On or about December 4, 2019, GAUTEREAUX e-mailed EDSON, SHORR, and King: "FLAT-FEE CONTRACT ([Laboratory Z]) We are re-working our current agreement with [Laboratory Z] to better guarantee that we generate income for December under our agreement with them. The current agreement calls for a payment to Autumn Partnership of $189,000 at 100 samples per month. However, neither Adam nor I feel confident that that the current flat-fee payment structure is appropriate at this point of our engagement with them. Although we remain confident that we can hit that volume (either 50 or 100 samples submitted for adjudication per month), Adam felt that if we set aside the first agreement and offered a flat-fee payment of $50,000 our likelihood for payment in December would be greatly enhanced. I agree. We have a

23

meeting set tomorrow a.m. to swap-out agreements with them, with the proviso that we retain a payment in December (this time at the lower amount of $50k).”

70.    On or about December 22, 2019, GAUTEREAUX e-mailed SHORR, King, Wellman, O'Sullivan, and Roiter a "draft CPA letter" received from an individual at Laboratory Z, stating: "I received from Matt Ryan an exemplar doc of a CPA letter that he would like Autumn Partnership to have our CPA issue once we scale up to $90k flat fee payments. He also expressed in a text to me that he'd like to get upwards of 300 per month from us as we continue to improve our delivery month-over-month." The attached draft letter stated that "under state and federal healthcare laws any flat fee charged must result from the parties' arms-length negotiations, that do *not* take into account any volume or value or referrals . . . ." and called for the CPA to "carefully analyze" eight factors to identify a "fair value compensation range."

71.    On or about January 9, 2020, GAUTEREAUX e-mailed SHORR, King, O'Sullivan, and another, referring to the "CPA letter" and stating, "I truly don't think this won't [sic] be anything more than a pretextual signing . . . ."

72.    On or about February 18, 2020, King sent a draft marketing contract to GAUTEREAUX, SHORR, Roiter, Wellman, and another, which provided: "SERVICES RATE: The SERVICE PROVIDER shall invoice COMPANY at _____ Dollars per _____ for Services listed in Exhibit C."

73.    On or about March 20, 2020, Wellman e-mailed ADAM SHORR and King "Re: Todd and Danny agreement," attaching the "marketing agreement" for marketing

24

group Sunrise Consulting Group LLC, which provided that Claro would pay the marketing company $100,000 per month for "marketing and business services."

74.    On or about March 23, 2020, Roiter caused a Claro employee located in Colorado to provide a "Marketing Business Services Agreement" for Marketing Company A, located in Colorado, which the employee e-mailed from Colorado to King, Roiter, and Wellman.

75.    On or about April 7, 2020, King e-mailed GAUTEREAUX, Wellman, and another attaching a "draft[ ] [s]ales agreement for your reference and edits" and stated, "We should nail down an agreement on the high performers as we discussed to get them starting conversations."

76.    On or about April 7, 2020, King e-mailed GAUTEREAUX and Wellman and asked, "When do you feel there will be draft agreements to review from the reps on their commitments to volume and test modalities etc?"

77.    On or about April 26, 2020, King asked Shorr, "Did Todd ever wire the money to [telemedicine provider]" and SHORR responded, "yes.. they said they wired."

78.    On or about June 16, 2020, King e-mailed Roiter, SHORR, Wellman, O'Sullivan, GAUTEREAUX, EDSON, and another stating, "Just as a follow up to our discussion earlier, we put together a projection by July 15th to have the following volume delivered into the Lab based on flat rate contracts," followed by a table listing marketers and "Volume" for each.

79.    On or about June 27, 2020, SHORR e-mailed King: "Leo 80 / Joey 70 / Brian 15 / Dodd 25 / 1500 seat center 40 / Manoj transfer to parker 120 (very realistic..

25

can easily do 20-30x that.. have done it with him many times) he is going to start this week / Alex 40 / would like to go over in detail how we are going to pay for these."

80.    On or about June 19, 2020, in response to receiving "sample trackers up to date" from a Colorado Claro employee, Roiter informed SHORR, "For Parker that's the second contract. 5 days into it. The first one he finished his 50 for the month."

81.    On or about July 23, 2020, SHORR forwarded messages from Individual C (a marketing company representative) to King via WhatsApp that included a document titled "Monthly Swab Count as of 7-22-20.pdf" and a message stating, "I figured roughly 146k owed to me for tomorrow payout minus 38,500 / Leaves 107,500 due to me / All corrections will be fixed by tomorrow."

82.    On or about July 24, 2020, King e-mailed EDSON stating, "I have approved 2 wires that require sign off today," and listed "[Individual C] 100k."

83.    On or about August 12, 2020, SHORR e-mailed King an invoice from Marketing Company H for "Advertising and Consulting," "Marketing Services," and "Customer Service" identified in hourly increments with an "hourly rate" of $185 and attached a list of 32 patient names with "Test Type" identified as "Cardio."

84.    On or about August 20, 2020, SHORR e-mailed King an invoice from a marketer for "Customer Service" at a "Rate" of "100.00", totaling $14,500, and attaching an excel spreadsheet titled, "CGX_PGX Accepted_Customer Name 20200814.xlsx" listing eleven "customers."

85.     On or about August 20, 2020, SHORR e-mailed King an invoice from a marketer for "Advertising and Consulting" with a "QTY" of 16 and "Unit Price" of $150 and for "Marketing Services" with a "QTY" of 3 and a "Unit Price of $100."

86.     On or about August 21, 2020, King forwarded SHORR and Roiter a spreadsheet titled "17. [marketer] Complete Samples YTD.xlsx" identifying "accepted" and "rejected" beneficiaries and stated "Fyi. Lets discuss so we can determine payment."

87.     On or about August 31, 2020, SHORR sent King a "revised" invoice for a marketer for "Advertising and Consulting," "Marketing Services," and "Customer Service" that removed a list previously attached to the invoice that provided "Patient Data" and a "Return Count" of 19.

88.     On or about September 1, 2020, as reflected in minutes of an executive meeting involving King, Wellman, Roiter, SHORR, O'Sullivan, EDSON, GAUTEREUAX, and another, King reported that "Everyone hit their marketing quote for the month by the third week." King also requested of the group to "Please ensure that all contracts are in place before payment is made so that we ensure compliance during audits."

89.     On or about September 4, 2020, King texted EDSON that he approved "4 wires for marketing services in August" and listed the marketing group and amount of the payment to each. EDSON responded, "I will get them approved in next 20 minutes / Those are some large wires. Hopefully they'll perform according to expectations." King explained, "Yes. The volume is already in the lab."

27

90.     On or about September 10, 2020, SHORR texted a marketer: "I went over it with you yesterday …. we can do it again so it is 100% accurate.. I took what you billed last time then the 13 cgx, 8 pgx, 1 cardio with your numbers / 300 per cgx for you." Later in the same text thread, SHORR texted the marketer: "also can you erase anything discussing paying on tests as soon as you can."

91.     On or about September 10, 2020, SHORR received a text from a marketer which discussed invoices and stated, "The 2nd one was $16,000 ; 8 cgx x $1700; 4 PGX x $300 and 1 Cardio 1 x $1200," and SHORR responded, "pls remove all of this."

92.     On or about September 17, 2020, SHORR forwarded King, Roiter, and another a sham invoice for Individual C's marketing company.

93.     On or about October 30, 2020, SHORR forwarded reports in three separate e-mails to three marketers identifying accepted samples and rejected samples with reasons for rejection.

94.     On or about November 12, 2020, Wellman e-mailed SHORR, copying King, with "2 reports. A sample tracker and a detailed scrubbing report. It is pretty basic and super clear. Not sure how much clearer we can make it. There are 4 status: good to go / scrubbing / rejected / on hold / all color coordinated. Then the detailed scrubbing sheet tells them why they are rejected so they can correct it."

95.     On or about November 13, 2020, SHORR forwarded an invoice to King and another for a marketing company, stating "wanted to get these into you today even though I understand Monday to be the date where wires are going to be sent." The forwarded e-mail SHORR sent from the marketer explained that "the last two weeks in

October we experienced a drop in billable services," that "I anticipate the billable service amounts for this current period will be similar," and further that, "I do believe we will be able to make up the serviceable hours by years end." The attached invoice had a "flat fee" amount of $100,000 struck through and various "services" listed at an hourly rate for a lesser total of $85,250.

96.    On or about December 17, 2020, SHORR e-mailed a sham signed Marketing Business Services Agreement to a Claro employee in Colorado, which SHORR identified as a "Flat Fee agreement."

97.    On or about January 7, 2021, SHORR forwarded a marketer an e-mail from Roiter with the Subject, "Signed Agreement Cancer Diagnostic LLC" with the attachment "Alliance Diagnostics and Cancer Genetic Testing Group Flat Fee Agreement." The attached sham Marketing Business Services Agreement was dated December 15, 2020, and included a fee provision for payment of $160,000 per month for "Services."

98.    On or about January 11, 2021, SHORR forwarded an e-mail to Wellman, King, and Billing Company employees from a marketer asking for "'cheat codes' associated with each payor contracted with Alliance…." SHORR asked, "Are there some granular codes/prefixes we can send him?"

99.    On or about January 12, 2021, King e-mailed EDSON an attachment of "wires that require your approval." Within his email, King identified certain wire recipients, including the entities in which the co-conspirators held their Tesis shares, with the explanation that "all wires for the participation in the secondary raise," as well

29

as two "marketing groups that provider [sic] services to our Lab in December." The amounts for the wires to the co-conspirators' ownership entities range from approximately $780,000 to approximately $5.8 million.

100.   On or about January 22, 2021, King texted SHORR, "Don't respond to charles email. He referred to 40% on other agreements and ekra / Thats a sanction because its in writing poses a problem."

101.   On or about February 13, 2021, SHORR e-mailed King and another a sham "Flat Rate" agreement for Individual H's marketing company.

102.   On or about February 16, 2021, King e-mailed EDSON a sham Marketing Business Services Agreement between Alliance and a marketing company.

103.   On or about March 1, 2021, SHORR e-mailed King and another, "Marketers that have fulfilled hours" followed by a list of marketers and payment amounts. The same day, SHORR followed up to his e-mail stating, "my apologies… left out [an additional marketer] 7k."

104.   On or about March 5, 2021, SHORR e-mailed Roiter a spreadsheet calculating the number of CGX, PGX, and Cardio samples submitted for a marketer, the amount owed per test, the total amount paid on these calculations, and the total amount due.

105.   On or about March 7, 2021, EDSON e-mailed King regarding contract negotiations with a marketing group. He was responding to an e-mail from the marketing group to King in which the marketer said that "the contract is too low (from a volume standpoint) and we will hit the year end numbers within the first 60 days. We

would like to (before this contract is implemented – monetized), to go back to the original schedule as proposed by Ron." King forwarded this e-mail to EDSON, who responded, "I am completely OK with increasing the volume if you feel comfortable with that …."

106. On or about March 16, 2021, SHORR e-mailed King and another a sham Marketing Business Services Agreement for Marketing Company K and stated, "After today we are going to change the contract to 1x monthly."

107. On or about April 24, 2021, King e-mailed EDSON a Marketing Business Services Agreement for Marketing Company F and stated, "I have attached a draft agreement for a new marketing group. It is obviously is [sic] quite substantial and will bring substantial business. This is just a draft and open for review and discussion before it is sent to the marketer early next week. If you have time Sunday or Monday to discuss let me know what works best for you."

108. On or about April 27, 2021, King spoke to EDSON telephonically and explained that the contract for Marketing Company F was for 1500 samples per month at approximately $1700 per sample, and that Roiter had "negotiated verbally" with the marketer and "if they did not bring the volume or the marketing efforts did not yield the revenue needed, we just make a change, we just terminate."

109. On or about April 27, 2021, EDSON e-mailed King regarding the contract for Marketing Company F, which they had discussed on April 27, 2021, stating: "I think the contract as written, if approved by your legal counsel, is fine with me. I know you

31

don't need me to say this, but please monitor the situation closely to make sure all 'expectations' are met as it proceeds."

110.   On or about June 21, 2021, King reported during an executive meeting including Roiter, EDSON, and Wellman that (following some reimbursement changes) Tesis had modified its panels so there would be no loss of revenue. King asked if they "want to offer any more to anyone new to entice them for PGX business," and further stated that he and Roiter "need to take time tomorrow or tonight to look at panels and map out the scale and maintain margin and come up with a new scale."

111.   On or about August 2, 2021, SHORR texted Roiter, "Hi Adam did you get any word on payment? / From [Individual K]. Not sure how you feel about this. If he is even due half."

112.   On or about August 5, 2021, EDSON e-mailed King to inform him that wires King had requested for thirteen marketing groups had been approved, including for Marketing Company F.

113.   On or about August 5, 2021, King spoke with O'Sullivan on the phone and advised him on communications with marketers regarding volume. King told O'Sullivan to tell a marketer not to "put anything in writing anymore based on volume," but that O'Sullivan could bring the contractor on, and they would "just basically back into it." King further stated:

> I saw your email on, uh, bringing [marketer] onboard. The only reason I didn't respond to it is [the marketer] put in there specifically volumes, which is a compliance issue, he can't refer that way to discussion points. That's the reason why I didn't respond to the e-mail, because it would then acknowledge that we understood he's talking about price for volume. So, anytime someone does that and they e-mail you and say, "Hey I have 20

of this or 100 of that or 50 of that and you know, can I get 1200 per sample"' or whatever it is, just don't even respond to it on e-mail. Don't even acknowledge it, just pick up the phone and call them and say, you know, you cannot put any of those things in writing . . . .

114.  On or about May 3, 2021, as reflected in minutes of an executive meeting involving King, Wellman, Roiter, EDSON, and another, Roiter reported that he was "putting together 2 or 3 new deals. One is 1200-1500/month, the other 1000/ month to start in May." Roiter further noted, "Closed one today for 150 samples."

115.  On or about May 3, 2021, as reflected in minutes of an executive meeting involving King, Wellman, Roiter, EDSON, and another, King reported that he "closed another group 200 and another of 2,000. They are going to scale a bit. Month 1, 700/month, month 2, 1400 and month 3 will be 3000."

116.  On or about August 6, 2021, Roiter e-mailed employees of Billing Company and Claro, informing them that, "yesterday was payday for our reps," that there were "multiple complaints that the numbers are not correct and that conversations were had that the amount of samples received by the lab, number of approved and number of corrected samples," and asking the e-mail recipients to "provide me with the amount of samples received for the following groups in July and I need to know the number or samples accepted after the corrections were sent in."

117.  On or about August 30, 2021, as documented in meeting minutes, King instructed participants in an "executive meeting," including EDSON, Wellman, and another that the laboratory needed to get samples tested sooner after arrival in the laboratory to help with margin because "[w]e are pushing too much forward to the following months while marketer payments are high due to the volume they bring in."

33

118.    On or about September 20, 2021, as reflected in minutes of an executive meeting involving King, Wellman, Roiter, EDSON, and another, the co-conspirators discussed that "[Marketing Company G] is a new lab group. These are primary care providers and they did a few hundred samples in a few weeks. They are on track to perform well. Based on projections they will be given another contract with 303 and spread the wealth with other locations."

119.    On or about October 25, 2021, King discussed the potential acquisition by Tesis of a marketing company they were working with. King stated that if the marketing company "scaled" to 2500 samples per month, they would be paying them $3.75 million per month as an external marketer, but if they brought them on board, they would cut that in half. King told Edson that neither marketers nor employees can be compensated based on "volume or value" and proposes that it makes more sense to discuss acquiring the marketer rather than offering the marketer a new contract with one of Tesis's other labs to pay them for more volume.

120.    On or about November 22, 2021, King received an e-mail from a Billing Company employee quoting a notice the employee had received that stated, "criminal findings found on Provider-Owner VICTOR ROITER." In response, King directed, "Don't use him anymore for ownership paperwork."

121.    On or about December 1, 2021, King described to EDSON how they could still earn money from samples for which the Tesis Laboratories would no longer bill because they stopped taking referrals for genetic testing authorized by telemedicine providers. King explained they could send telemedicine samples to another third-party

34

lab, which would bill Medicare. He stated that Tesis would continue to pay marketers for the referrals, which referrals Tesis would then forward to this third-party lab.  King indicated that he had already "dangled" the idea in front of another lab and "they don't really care—telemed, compliant, whatever." EDSON asked to verify that he "understood the math right." King stated marketers were typically paid $1200 to $1400 per sample. King explained the third-party lab would want their cost of goods covered (e.g., $350) plus four to five hundred on top of that per test, then Tesis would keep the rest. EDSON responded that this was "kind of like a reference" agreement. EDSON stated that if adjudication is $4000, and the other lab takes $750, then there's $3250 left; they deduct $1800 or less for the marketer payment, and Tesis would have the remainder.

122.   On or about January 24, 2022, King informed EDSON that Victor Roiter had been convicted of a felony, resulting in payer rejections, and that they would have to put a new "owner" on payer paperwork.

123.   On or about May 20, 2022, King forwarded EDSON "pertinent information for your reference on the Victor Roiter settlement." The e-mail attached an agreement for the assignment of units from Roiter to another entity, Articles of Organization for that entity, and a Membership Unit Purchase and Settlement Agreement, which stated that Roiter had pled guilty to a felony charge that has "placed Roiter on at least one if not more of the excluded persons lists that has made Seller's continued performance under the Services Agreement and its ownership of the Units problematic for Tesis's governmental approvals...."

35

124.    On or about June 1, 2022, GAUTEREAUX authorized the addition of his name as an owner for 303 Diagnostics LLC to the Medicare enrollment information.

The foregoing is in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

125.    The allegations above are realleged and incorporated by reference for purposes of alleging forfeiture pursuant to Title 18, United States Code, Sections 982(a)(7), 982(a)(8), and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

126.    Upon conviction of the violations alleged in Count 1 involving the commission of violations of Title 18, United States Code, Sections 1349, 1343, and 1347, the defendant identified in Count 1 shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7), 982(a)(8), and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense.

127.    Upon conviction of the violations alleged in Counts 2 through 12 involving the commission of violations of Title 18, United States Code, Sections 1347 and 2, the defendant identified in those counts shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7), 982(a)(8), and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of the defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense.

36

128.    Upon conviction of the violations alleged in Count 13 involving the commission of violations of Title 18, United States Code, Section 371 and Title 42, United States Code, Section 1320a-7b(b), defendants identified in Count 2 shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7) and 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all of each defendant's right, title, and interest in all property constituting and derived from any proceeds the defendant obtained directly and indirectly as a result of such offense.

129.    If any of the property described above, as a result of any act or omission of the defendants:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been comingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

//

//

//

A TRUE BILL:

<u>Ink signature on file in Clerk's Office</u>
FOREPERSON

PETER MCNEILLY
United States Attorney

By: <u>*s/ Anna K. Edgar*</u>
Anna K. Edgar
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: (303) 454-0100
Fax: (303) 454-0405
E-mail: Anna.Edgar@usdoj.gov
Attorney for the United States